IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHRISTIAN DEAN COURTNEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2876 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 18) and Defendant's Cross-Motion for Summary Judgment (Doc. 13). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's motion.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income under Title XVI of the Social Security Act ("the Act").

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Doc. 11, Ord. Dated Dec. 15, 2017.

## A.  **Medical History**

Plaintiff was born on April 4, 1996, and was eighteen years old on the date of redetermination of disability under adult standards.[2] Plaintiff had received supplemental security income as a child.[3]

Plaintiff sought treatment at the Lone Star Family Health Center beginning in March 2014.[4]  In his first appointment, Plaintiff's grandmother described his attention deficit hyperactive disorder ("ADHD") symptoms as the following: "short attention span, impulsive behavior, hyperactive behavior, easy distractibility, poor listening, careless mistakes, difficulty remaining seated, [and] excessive talking and interrupting others."[5] Plaintiff had taken Adderall for a long time, which helped to quell his symptoms.[6]  Plaintiff's bipolar symptoms were reported as "distractibility, racing thoughts, periods of excess energy and loss of interest, [and not including] flight of ideas."[7] Plaintiff was re-prescribed Adderall for ADHD and was instructed to "adopt healthy behaviors" such as exercising, wearing a seatbelt, eating

---

[2]    See Tr. of the Admin. Proceedings ("Tr.") 12, 18, 31.

[3]    See Tr. 10.

[4]    See Tr. 388.

[5]    Id.

[6]    See id.

[7]    Id.

healthy, and refraining from smoking.[8]  Plaintiff was referred for a psychiatric evaluation.[9]  On June 25, 2014, Plaintiff reported that he had one poor sleeping episode.[10]  Plaintiff was described as "alert, oriented to name" with a "stable mood" and "consistent" affect and, while he had a low level of eye contact due to staring at his cell phone, he had a goal-oriented thought process and "normal" speech.[11]  Plaintiff reported no hallucinations, paranoia, or suicidal or homicidal ideation.[12]  Plaintiff was taking Adderall for ADHD and Depakote and Seroquel for bipolar disorder.[13]

Plaintiff underwent a psychiatric evaluation on March 27, 2014.[14]  It was noted that Plaintiff graduated high school in January 2014 and had moved in with his grandmother where he was not "doing much."[15]  Plaintiff had been "doing well" with his medications.[16]  Plaintiff displayed a cooperative attitude, an appropriate affect, a euthymic mood, spontaneous speech, a focused thought process, no hallucinations, no delusions, no homicidal

---

[8]     See Tr. 389.

[9]     See id.

[10]    See Tr. 382.

[11]    Id.

[12]    See id.

[13]    See id.

[14]    See Tr. 371-75.

[15]    Tr. 371.

[16]    Id.

ideation, and no suicidal ideation, impaired insight, or limited judgment.[17] He was oriented and his concentration was intact.[18] It was noted that Plaintiff had bipolar disorder, Asperger's syndrome, ADHD, and oppositional defiant disorder ("ODD").[19] On April 3, 2014, Plaintiff's global assessment of functioning ("GAF") score was fifty, indicating serious symptoms or any serious impairment.[20]

Plaintiff returned to the Lone Star Family Health Center on October 9, 2014.[21] Marwan Al-khudhair, M.D. ("Dr. Al-kudhair") noted that Plaintiff had "no behavioral problems" and "no eating difficulties."[22] Plaintiff slept ten hours every night.[23] On November 5, 2014, Plaintiff was treated by Robert Bogan, M.D. ("Dr. Bogan").[24] Plaintiff reported that he had "mostly been doing well recently" and that he was not experiencing any unprovoked changes in mood.[25] Plaintiff was still taking Adderall and explained that it was helping him focus on Facebook.[26] Plaintiff's grandmother

---

[17] See id.

[18] See id.

[19] See Tr. 376.

[20] See Tr. 368.

[21] See Tr. 442.

[22] Id.

[23] See id.

[24] See Tr. 441.

[25] Id.

[26] See id.

explained that when he took the Adderall, he was "easier to deal with" and that it helped his appetite remain "normal."[27] Plaintiff was cooperative, displayed an appropriate affect, had normal speech, goal-oriented thoughts, and had no suicidal ideation, homicidal ideation, or psychosis.[28]

Plaintiff returned on March 4, 2015, for treatment related to his bipolar disorder, reporting difficulty sleeping.[29] His grandmother stated that he was able to sleep better once he took his medication.[30] Plaintiff's mental status examination was normal.[31] On July 8, 2015, Plaintiff reported that his mood was "good" and that he was counseling people online about their mental issues.[32] It was noted that Adderall was helping Plaintiff focus and that it suppressed his appetite.[33] However, Plaintiff had trouble sleeping, as he would sometimes stay up for three days at a time and then sleep for two straight days.[34] Another mental status examination was conducted which was relatively normal, but

---

[27]   Id.

[28]   See id.

[29]   See Tr. 518.

[30]   See id.

[31]   See id.

[32]   See Tr. 513.

[33]   See id.

[34]   See id.

noted that his speech was slow.[35]

Plaintiff underwent counseling on August 26, 2015.[36]  He had normal psychomotor and activity levels, and easily established rapport; the counselor described him as "friendly" and "adequately groomed."[37]  Plaintiff's eye contact was appropriate, his speech was normal, his thoughts were logical and undirected, and his mood was positive with a wide range of emotion.[38]  Plaintiff's grandmother expressed her concern over his sleeping habits.[39]  Plaintiff stated that he did not want to work because he did not want to interact with people; he also reported that he talked with his friends on Skype, played video games, and looked at the internet.[40]  Plaintiff reported that he had begun an online relationship with an eighteen-year-old woman in South Dakota who would come live with him in two years after she completed college.[41]

Plaintiff attended another therapy session in December 2015.[42] He was described by the counselor in a similar manner to his August 2015 appointment and his thoughts were deemed rational and goal-

---

[35]  See id.

[36]  See Tr. 505.

[37]  Id.

[38]  See id.

[39]  See id.

[40]  See id.

[41]  See id.

[42]  See Tr. 493.

oriented.[43]  The counselor noted that Plaintiff did not give a specific reason for missing his previous appointments, as the last counseling appointment he attended was in August 2015.[44] Counseling notes reflect that, because Plaintiff stayed up late watching television, he often overslept.[45]  It was recorded that Plaintiff expressed a lack of interest in receiving therapy, explaining that he would rather stay at home.[46]  Plaintiff stated he had no interest in working, and his grandmother concurred that he should not work.[47]

In October 2015, Plaintiff reported that he was doing well and had no complaints.[48]  Plaintiff was counseled to lose weight through better nutrition and exercise.[49]  On January 14, 2016, Plaintiff requested a refill of Adderall due to a recent weight gain.[50] Plaintiff reported daily episodes related to his bipolar disorder, symptoms of which included distractibility, hyperactivity, agitation, and poor concentration, and Dr. Al-khudhair noted that his symptoms were moderately severe but improving with medication.[51]

---

[43]     See id.

[44]     See id.

[45]     See id.

[46]     See id.

[47]     See id.

[48]     See Tr. 496.

[49]     See Tr. 497.

[50]     See Tr. 489.

[51]     See id.

Plaintiff also attended a psychotherapy appointment on that same date.[52] There, Plaintiff displayed "fidgety" motor activity and was dressed casually with adequate hygiene.[53] Plaintiff had normal speech and appropriate eye contact with no homicidal or suicidal ideation or psychosis.[54] His mood was "anxious" with a "wide range of emotion" and an "appropriately shifting affect."[55] Plaintiff's thoughts were not goal-oriented but were described as rational.[56] Plaintiff reported that he sometimes felt like "punching somebody" due to frustration and stated that he was bored at home and would not ride his bike anymore because there was no one to hang out with.[57] Plaintiff reported that he had carried a knife for protection since he was ten years old.[58]

On March 30, 2016, Plaintiff returned for a clinic appointment.[59] Plaintiff's bipolar symptoms of distractibility, hyperactivity, agitation and poor concentration were noted as moderately severe but improving with medication.[60] The symptoms

---

[52]    See Tr. 492.

[53]    See id.

[54]    See id.

[55]    Id.

[56]    See id.

[57]    See id.

[58]    See id.

[59]    See Tr. 487.

[60]    See id.

occurred three times a week rather than daily and were worsened when provoked by emotional or family-related stress.[61] It was noted that Plaintiff had not sought follow-up psychiatric treatment as instructed by his doctors.[62]

## B. **Disability Redetermination**

Plaintiff applied for supplemental security income benefits on March 1, 2005, alleging an onset date of February 1, 2004.[63] In a disability report dated May 13, 2014, Plaintiff reported the following medical conditions: Asperger's syndrome, bipolar disorder, ADHD, ODD, learning disabilities and high blood pressure.[64] Plaintiff explained that he had never worked.[65] In an updated disability report from July 29, 2015, it was reported that Plaintiff "seem[ed] more depressed."[66]

In support of Plaintiff's application, several people, including his grandmother, wrote letters contending that Plaintiff was disabled.[67] Marilyn Abbott, a neighbor and retired teacher, opined that Plaintiff was "severely disabled," noting his mood

---

[61]    See id.

[62]    See id.

[63]    See Tr. 192-206.

[64]    See Tr. 210.

[65]    See id.

[66]    Tr. 246.

[67]    See Tr. 266-73.

swings and difficulty concentrating.[68]  Another neighbor, Kalen Bogart, wrote that Plaintiff had "high" intellectual functioning that was impaired by his lack of concentration, problematic temperament, and difficulty regulating his mood.[69]

On September 3, 2014, a psychiatric review technique assessment was performed by Mischca Scales, Ph.D., ("Dr. Scales").[70] Dr. Scales noted Plaintiff's ADHD and bipolar disorder diagnoses and stated that Plaintiff displayed symptoms of hyperactivity.[71] In terms of Plaintiff's degree of limitation, Dr. Scales concluded that Plaintiff did not meet the paragraph B criteria, finding that he had: (1) mild restriction in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation.[72]  Plaintiff also was found not to meet the paragraph C criteria.[73]

A mental residual functional capacity ("RFC") assessment was also completed by Dr. Scales on that same date.[74]  Plaintiff was found to be not significantly limited in the following areas: the

---

[68]     See Tr. 271.

[69]     See Tr. 273.

[70]     See Tr. 415-27.

[71]     See Tr. 416-18.

[72]     See Tr. 425.

[73]     See Tr. 426.

[74]     See Tr. 429-31.

ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to make simple work-related decisions; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others.[75]

Plaintiff was found to be moderately limited in the following areas: the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace

---

[75]    See Tr. 429-30.

without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to respond appropriately to changes in the work setting.[76] Plaintiff was found to be markedly limited in his ability to understand, remember, and carry out detailed instructions.[77] Dr. Scales concluded that Plaintiff could "understand, remember and carry out only simple instructions, make decisions, attend and concentrate for extended periods, interact adequately with others, and respond appropriately to changes in routine work settings" and that Plaintiff's allegations were "not wholly supported" by the record.[78]

On September 9, 2014, the SSA found Plaintiff was not disabled upon re-evaluation using the adult standard for disability.[79] On May 20, 2015, the SSA again found Plaintiff not disabled upon reconsideration.[80] Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[81] The ALJ granted Plaintiff's request[82] and

---

[76] See Tr. 429-30.

[77] See id.

[78] Tr. 431.

[79] See Tr. 93-95, 435.

[80] See Tr. 107-20, 436.

[81] See Tr. 121-26.

[82] Plaintiff's original hearing was set for March 9, 2016. However, Plaintiff had not obtained representation at that time and requested to postpone that hearing until he could find representation. The ALJ granted his request and

conducted a hearing on July 29, 2016.[83]

## C. <u>Hearing</u>

At the hearing, Plaintiff, his grandmother Mary Sanchez ("Sanchez"), and a vocational expert, Cheryl Swisher ("Swisher" or "VE") testified.[84]   Plaintiff was represented by an attorney.[85]

Plaintiff testified that he was unmarried and lived with his grandmother.[86]   Plaintiff was able to read and write English and perform basic mathematic skills.[87]   In terms of education and training, Plaintiff earned a high school diploma but did not have any vocational training.[88] Citing his mood swings, sleep patterns, asthma, and other issues, Plaintiff explained that he had never looked for a job.[89]

While attending Huntsville High School, Plaintiff was enrolled in a special education program where he received extra educational assistance.[90]   During his tenure at that school, there was an incident where Plaintiff became angered by the teacher helping him,

---

reset the hearing for July 29, 2016.  <u>See</u> Tr. 79-88.

[83]    <u>See</u> Tr. 26-77.

[84]    <u>See</u> <u>id.</u>

[85]    <u>See</u> Tr. 28.

[86]    <u>See</u> Tr. 31-32.

[87]    <u>See</u> Tr. 32.

[88]    <u>See</u> <u>id.</u>

[89]    <u>See</u> Tr. 32-33.

[90]    <u>See</u> Tr. 33-34.

and he left school without permission.[91]

Plaintiff was arrested twice as a juvenile.[92]  Plaintiff explained that in one instance, he was "framed" by a girl who cut her shirt with scissors and blamed him.[93]  The other incident occurred on September 29, 2010, when he was aggressive towards a Child Protective Services ("CPS") case worker, prompting, in part, his admission to a psychiatric hospital that same date.[94]  Plaintiff said that he did not touch the case worker, but he did become angry with her because "[s]he was making [his] grandmother cry."[95]

Plaintiff was hospitalized three times for psychiatric problems, with the latest occurrence in 2010, at age fourteen.[96] Plaintiff frequently missed school days in 2010, and, as a result, CPS removed him from his grandmother's home and placed him in psychiatric care at IntraCare Hospital.[97]  Once he was discharged from IntraCare Hospital, he was involuntarily taken by CPS to Bayes Achievement Center ("Bayes Center"), a residential treatment and educational center for children with special needs and behavioral

---

[91]    Tr. 34.

[92]    See Tr. 39-40.

[93]    See id.

[94]    See Tr. 40.

[95]    Id.

[96]    See Tr. 34-35.

[97]    See Tr. 35-38.

14

problems.[98]   Plaintiff explained that there was housing for the
students and that, in addition to attending classes, students were
required to clean their dorm area and take care of animals.[99]

Plaintiff's attorney explained that Plaintiff's records from
the Bayes Center showed that he "enjoyed interacting with peers"
but needed "to be monitored closely when talking to peers for
appropriateness."[100]   Plaintiff explained that he would "cuss"
frequently, and if he became angry with another student, he would
sometimes strike them.[101] While Plaintiff was enrolled at the Bayes
Center, he was on "pretty good" behavior and was rewarded, as a
result, with community outings.[102]   On the outings, there would
usually be one to two staff members per four students.[103]  Plaintiff
was also allowed weekend visits with his grandmother.[104] Plaintiff
refused to return to the school after these visits and he
physically resisted getting into the school van.[105] As a result,
the Bayes Center had to bring four staff members to pick him up

---

[98]     See Tr. 36-37.

[99]     See Tr. 37-38.

[100]    Tr. 39.

[101]    Id.

[102]    Tr. 40-41.

[103]    See Tr. 41.

[104]    See Tr. 41-42.

[105]    See id.

15

after a home visit.[106]  Plaintiff explained that he did not like attending the Bayes Center because his freedoms were limited, however, he acknowledged that he could not return to Huntsville High School because of the incident where he ran from the school.[107]

As of the date of the hearing, Plaintiff stated that he had been living with his grandmother, Sanchez, for around a year and a half, following his release from the Bayes Center.[108] Plaintiff explained that his mother died years earlier after suddenly collapsing and hitting her head on the counter.[109]  Plaintiff's attorney stated that some reports said that his mother's death was a suicide, reports which Plaintiff denied.[110]  His mother's death prompted an in-patient admission to IntraCare Hospital.[111] Plaintiff stated that he was depressed at the time and had suicidal thoughts.[112]  Plaintiff also became angry when other people talked to him about how his mother died.[113]

Sanchez accompanied Plaintiff to his medical appointments, and Plaintiff testified that he received treatment at "quite a few

---

[106]  <u>See</u> Tr. 42.

[107]  <u>See</u> Tr. 43.

[108]  <u>See</u> Tr. 43-44.

[109]  <u>See</u> Tr. 46.

[110]  <u>See</u> <u>id.</u>

[111]  <u>See</u> <u>id.</u>

[112]  <u>See</u> Tr. 47.

[113]  <u>See</u> <u>id.</u>

places."[114]  Plaintiff acknowledged that he did not always pay attention to what doctors told him, citing his short attention span, and he would often let his grandmother talk to the doctor instead.[115]  Plaintiff's grandmother also shopped for his clothing.[116]  Upon questioning by his attorney, Plaintiff stated that he did not always get along with his grandmother and sometimes he would become very angry at her because she nagged him about doing chores.[117]  They fought on a daily basis.[118] Plaintiff's room did not have a lock on the door because the last time he was taken to Bayes Center, he locked himself in his room and barricaded the door.[119]

Plaintiff acknowledged that Sanchez had to remind him to bathe; otherwise, he would only bathe twice per week, citing the fact that he rarely would leave the house to socialize.[120]  In interactions with new people, Plaintiff explained that he was "shy."[121]  Plaintiff had one friend "outside of Facebook" who would

---

[114]    Tr. 44.

[115]    See Tr. 55.

[116]    See Tr. 46.

[117]    See Tr. 51.

[118]    See Tr. 52.

[119]    See Tr. 53.

[120]    See Tr. 44-45.

[121]    Tr. 39.

come to Sanchez's apartment around three times per month.[122] However, Plaintiff recounted an incident where Sanchez called the police on this friend, and the friend was no longer allowed to visit.[123] Plaintiff occasionally helped his grandmother with cleaning, carrying groceries, and watering plants.[124]

Citing a lack of motivation, Plaintiff testified that he had "not cleaned his room in ages."[125] Plaintiff sometimes watched television and was normally able to understand the plot line.[126] Plaintiff also swam, but experienced back pain and soreness the next day.[127] Following his doctor's advice to exercise, Plaintiff rode his bicycle around his neighborhood.[128] Plaintiff sometimes experienced blurriness in his left eye and was prescribed glasses, but, as he wanted contact lenses, he did not wear his glasses often.[129]

Due to high blood pressure, Plaintiff took heart-related medication.[130] When he experienced high blood pressure, he was not

---

[122]    Tr. 45.

[123]    See Tr. 51.

[124]    See Tr. 47-48.

[125]    See Tr. 48.

[126]    See id.

[127]    See Tr. 48-49.

[128]    See Tr. 45.

[129]    See Tr. 45-46.

[130]    See Tr. 49.

be able to get out of bed due to pounding headaches.[131]  However, the medication addressed these headaches with no side effects.[132] Plaintiff also took medications for his psychiatric issues, but explained that he did not always wake up early enough to take them.[133]  While these medications did help with his mental issues "[a] bit," Plaintiff still had no motivation and interest in activities.[134]

In crowds of people, Plaintiff stated that he felt "[c]onstricted, claustrophobic," and uncomfortable.[135]  When Plaintiff went to McDonald's, he sat in a booth in the back of the restaurant because he was worried that the restaurant might be robbed.[136]  Plaintiff said he usually would go to a drive-through.[137]

Plaintiff was excused from the hearing, and Sanchez began her testimony.[138]  Sanchez explained that she had custody of Plaintiff since he was seven years old.[139]  Sanchez said that Plaintiff always had mental problems and, as a result, had a difficult time at

---

[131]    See id.

[132]    See Tr. 49-50.

[133]    See Tr. 50.

[134]    See Tr. 50-51.

[135]    Tr. 54.

[136]    See id.

[137]    See Tr. 55.

[138]    See Tr. 55-56.

[139]    See Tr. 57.

school.[140] Sanchez visited his school approximately once a week due to Plaintiff's behavioral issues.[141] Plaintiff often bit other students for making fun of him for his mental issues.[142] Plaintiff received his high school diploma from Huntsville High School although his course work was completed at the Bayes Center.[143]

Sanchez explained that she had requested that Plaintiff be removed from the courtroom because she did not want him to become angry during her testimony.[144] Plaintiff's grandmother said that he had a "temper" and had threatened to hit her on one occasion years earlier.[145] She also testified that when the state agency worker came to their residence to check on them, Plaintiff assured the case worker that he would not hurt Sanchez.[146]

According to Sanchez, Plaintiff did not have anyone visit him at their apartment.[147] Plaintiff refused to clean his room, so she would clean it for him.[148] Plaintiff read books on occasion.[149]

---

[140] See Tr. 57-58.

[141] See Tr. 58.

[142] See id.

[143] See Tr. 59.

[144] See id.

[145] See id.

[146] See id.

[147] See Tr. 60.

[148] See id.

[149] See Tr. 64.

Sanchez had to insist that he bathe himself, which he would only do one to three times per month.[150]  Without her insistence, Sanchez thought that he would never take a bath.[151]  Plaintiff would take the trash out if she asked, but he only liked to do it after dark so he would not be seen by anyone.[152]  Plaintiff did not cook for himself, but knew how to cook eggs.[153]  Sanchez believed that Plaintiff could not live on his own because he would spend his money and not remember to pay his bills.[154]  Plaintiff often performed three to four tasks at one time.[155]

At one point in time, Plaintiff tried to work for Sanchez's brother.[156]  Plaintiff was only able to work for four hours before burning himself on the machine with which he was working.[157] Sanchez also explained that Plaintiff would have difficulty working outside because he would get "overheated."[158] Sanchez believed that Plaintiff had difficulty remembering to complete tasks and spelling

---

[150]    See Tr. 60.

[151]    See id.

[152]    See Tr. 61.

[153]    See Tr. 60.

[154]    See Tr. 61, 64.

[155]    See id.

[156]    See Tr. 61-62.

[157]    See Tr. 62.

[158]    Id.

easy words correctly.[159]

Sanchez drove Plaintiff to his doctor's appointments.[160]  She did not want Plaintiff to get a driver's license because he got lost easily.[161]  She explained that sometimes Plaintiff got lost when he was biking, but he learned when he was lost to go to a certain area and from there to go home.[162]

Sanchez reported that Plaintiff did not handle stress well.[163]  Sanchez opined that Plaintiff would never get married.[164]  She stated that he had a girlfriend who lived in Kentucky that he met online but had never spent time with her in-person.[165]

At the conclusion of Sanchez's testimony, the VE discussed the capability of an individual with Plaintiff's RFC to perform jobs in the national or regional economy.[166]

The ALJ presented the following hypothetical individual:

I want you to assume a person of [Plaintiff's] age, education and work experience, who is limited to being able to understand, remember and carry out simple, well, let me say this, one or two-step tasks, could not operate at a production rate or pace work.  The individual would

---

[159]    See id.

[160]    See Tr. 63.

[161]    See id.

[162]    See id.

[163]    See Tr. 63-64.

[164]    See Tr. 64.

[165]    See Tr. 65.

[166]    See Tr. 67-77.

be limited to simple, work-related decisions and could
work in an environment which has few, if any workplace
changes. Furthermore, the individual would be limited to
occasional interaction with the public, and occasional
interaction with co-workers. Based off of that
hypothetical, is there work that such a person could
do?[167]

The VE opined that Plaintiff could perform work as a yard

worker, laundry worker, or office cleaner.[168] The ALJ then added

limitations to the hypothetical individual:

All right, for the second hypothetical, the individual
would be limited to the same limitations as stated in the
first hypothetical, however, I want you to make the
following change. Instead of occasional interaction with
the public, the individual would be limited to no
interaction with the public. And the remaining
limitations would remain the same. Are there jobs that
exist that such a person could do?[169]

The VE opined that a person with such limitations could perform the

yard worker, laundry worker, or office cleaner positions.[170]

For the third hypothetical individual, the ALJ added: "And for

the third hypothetical, if an individual is off-task more than 20

percent of the workday in addition to the limitations that were

previously given, is there other work that could be done?"[171]  The

VE responded that there would be no such jobs for this hypothetical

---

[167]    Tr. 69.

[168]    See Tr. 69-70.

[169]    Tr. 70-71.

[170]    See Tr. 71.

[171]    Id.

individual.[172]

Plaintiff's attorney presented a series of follow-up questions for the VE.[173] To all of Plaintiff's attorney's hypothetical limitations, the VE opined that there would be no jobs in the national or regional economy that such an individual could perform on a full-time basis.[174] The limitations posed by the attorney were as follows: (1) "the hypothetical individual would need to be prompted by his employer or supervisor two times every hour to complete a task, would there be any jobs in the national economy such an individual could perform" on a full time basis; (2) "the hypothetical individual has a marked limitation in his ability to maintain reliability, further indicating [that Plaintiff] would be tardy once or twice a week, would be absent from work two to three times per month, would there be any jobs in the national economy such an individual could perform;" (3) "the hypothetical individual should have no contact with the public, supervisors or co-workers because of social inappropriateness . . . would there be any jobs in the national economy" on a full-time basis; (4) "the hypothetical individual has a marked limitation in his ability to accept instructions and response to criticism;" (5) "the hypothetical individual wouldn't bathe for two to three months . .

---

[172] See id.

[173] See Tr. 71-75.

[174] See id.

. and would be unclean;" (6) "the hypothetical individual would have thoughts of intentionally attempting to harm a co-worker or a supervisor or the public, and would exercise such a thought if he felt that they were being unfair to him in any type of manner . . . assume that a person had that type of thought and would have threatening gestures to follow-up on that . . . this would occur once a week;" (7) "the hypothetical individual requires a highly structured work environment;" (8) "the hypothetical individual would need positive reinforcement every hour and verbal redirection every hour."[175]

After Plaintiff attempted to interrupt the ALJ's questioning of the VE, the ALJ directed the questioning back to Plaintiff, asking about his issues with heavy work and authority figures.[176] Plaintiff explained that his back hurt when he lifted heavy objects or swam; the ALJ inquired whether there were no medical records regarding Plaintiff's physical condition, to which Plaintiff's attorney responded that he was not aware of any.[177] As to his statement that he despised authority figures, Plaintiff stated that "because every time I end up with an authority figure, I end up getting restrained or something or they end up just being high and mighty, and I just can't stand that attitude set, and it pisses me

---

[175] Id.

[176] See Tr. 75-77.

[177] See Tr. 75-77.

off such much that I want to punch them."[178]

## D. **Commissioner's Decision**

On September 12, 2016, the ALJ issued an unfavorable decision.[179] Because Plaintiff turned eighteen on April 3, 2014, his disability application had to be re-evaluated under the standard for adults.[180] Plaintiff was eligible for supplemental security income benefits as a child through the month prior to the month he turned eighteen.[181] The ALJ recognized the following impairments as severe: "Asperger's syndrome; bipolar disorder; Attention-Deficit Hyperactivity Disorder (ADHD); and oppositional defiant disorder" but noted that Plaintiff's obesity, hypertension, and asthma were not severe impairments as there was no objective medical evidence demonstrating that these conditions caused him limitations.[182]

Plaintiff's severe impairments, individually or collectively, did not meet or medically equal disorders described in the listings of the regulations[183] (the "Listings"), according to the ALJ.[184] In

---

[178]    Tr. 76.

[179]    See Tr. 7-19.

[180]    See Tr. 12.

[181]    See id.

[182]    Id.

[183]    20 C.F.R. Pt. 404, Subpt. P., App. 1.

[184]    See Tr. 13.

particular, the ALJ considered Listings 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar, and related disorders), and 12.10 (autism spectrum disorder).[185] Because Plaintiff only had mild restriction in daily activities, moderate restriction in social functioning, moderate difficulties with concentration, and no episodes of decompensation after attaining the age of eighteen, the ALJ determined that Plaintiff did not meet the paragraph B criteria.[186] The ALJ also found that Plaintiff did not meet the paragraph C criteria.[187]

In determining Plaintiff's RFC to perform work-related activities, the ALJ discussed Plaintiff's claimed symptoms and his medical treatment and stated that she followed the regulatory requirements as to both.[188] When considering Plaintiff's symptoms, the ALJ first evaluated whether a medically determinable impairment could reasonably be expected to produce the alleged symptoms.[189] Second, the ALJ determined the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit[ed] the claimant's functioning," looking to other evidence in the record for those symptoms that are not

---

[185] See id.

[186] See Tr. 13-14.

[187] See Tr. 14.

[188] See Tr. 14-18.

[189] See Tr. 14-15.

substantiated by objective medical evidence.[190]

The ALJ discussed Plaintiff's medical treatment, including records from his appointments with Lone Star Family Health Center and Tri County MHMR.[191] The ALJ explained that the medical evidence contained no opinion from a treating physician finding that Plaintiff was disabled.[192] The mental assessments of the state agency medical consultants were given significant weight, with the ALJ finding them to be wholly consistent with the record.[193]

The ALJ engaged in a thorough recounting of Plaintiff's and his grandmother's testimony regarding the symptoms he experienced as a result of his impairments.[194] Specifically, the ALJ discussed the symptoms associated with his mental impairments and the impact that they had on his life.[195] The ALJ found that Plaintiff's testimony was "not entirely consistent with the medical evidence and other evidence in the record."[196] Therefore, the ALJ only gave Plaintiff's and his grandmother's testimony partial weight.[197] The ALJ concluded:

---

[190]    Tr. 15.

[191]    See Tr. 16-18.

[192]    See Tr. 17.

[193]    See Tr. 17-18.

[194]    See Tr. 15.

[195]    See id.

[196]    Tr. 16.

[197]    See id.

> After careful consideration of the evidence, the
> undersigned finds the claimant's medically determinable
> impairments could reasonably be expected to cause the
> alleged symptoms; however, the claimant's statements
> concerning the intensity, persistence, and limited
> effects of these symptoms are not entirely consistent
> with the medical evidence and other evidence in the
> record for the reasons explained in this decision.[198]

The ALJ found Plaintiff capable of performing a full range of work at any level of exertion.[199] The following nonexertional limitations were included in Plaintiff's RFC: (1) "understanding, remembering, and carrying out instructions involving 1-2 step tasks with no production rate or pace work;" (2) "can make only simple, work-related decisions in an environment with few, if any, workplace changes;" and (3) "can occasionally interact with coworkers and the public."[200]

Plaintiff had no past relevant work or transferable skills because he had never held a job.[201] Plaintiff was considered a younger individual with a high school education and the ability to communicate in English.[202] The ALJ relied on the VE's testimony that Plaintiff could perform work in the national or regional economy such as a yard worker, laundry worker, or office cleaner.[203]

---

[198] Id.

[199] See Tr. 14.

[200] Id.

[201] See Tr. 18.

[202] See id.

[203] See Tr. 19.

Therefore, the ALJ concluded that Plaintiff could make a successful adjustment to work and was therefore not under a disability as of September 30, 2014.[204]

Plaintiff appealed the ALJ's decision, and, on July 17, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[205]

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: (1) the ALJ applied proper legal standards in evaluating the record; and (2) substantial evidence in the record supports the decision.   Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.   Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.   Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).   Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(a); see also

---

[204]   See id.

[205]   See Tr. 1-6.

Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230

F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ erred by finding that Plaintiff's mental impairments did not meet the Listings. Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

Plaintiff contends that he meets the Listing, often citing medical records from the time period before he turned eighteen.

However, these records are not relevant to the determination of whether Plaintiff was disabled after he turned eighteen and could not properly be relied upon by the ALJ to determine if he met the adult listings. These records supported a finding of disability before Plaintiff turned eighteen but the SSA had to redetermine if he was disabled once he became an adult.

The relevant medical evidence does not support a finding that Plaintiff meets any mental health Listing. For example, in his appointment from June 2014 at the Lone Star Family Health Center, he had only one non-sleeping episode and his behavior was normal other than decreased eye contact due to looking at his cell phone. In October 2014, his grandmother reported that he had no behavioral problems or eating issues and he was sleeping ten hours a night. His mental status examinations from that year were normal, he was cooperative, and had an appropriate affect. He had normal speech and no suicidal or homicidal ideation. Plaintiff was repeatedly told to seek psychiatric counseling and failed to comply, often cancelling or failing to attend scheduled appointments without good cause. While Plaintiff testified that he did not get along well with others, he spent time on the internet where he interacted with others, including asking a girl he met to live with him. Plaintiff showed no interest in attempting to work. Plaintiff engaged in daily activities including exercise, helping his grandmother by carrying groceries and watering plants, talking with friends on

Facebook and Skype, and socializing with a friend who visited his apartment.

Additionally, the ALJ's determination is supported by the findings of the state agency consulting physicians, who found that Plaintiff only had moderate or mild limitations as to the paragraph B criteria. These opinions were consistent with the medical evidence in the record and provide substantial evidence in support of the ALJ's finding that Plaintiff did not meet any Listing.

Therefore, the ALJ's decision finding that Plaintiff did not meet any Listing was supported by substantial evidence and Plaintiff's motion should be denied.

## IV. Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 18) and **GRANTS** Defendant's Cross-Motion for Summary Judgment (Doc. 13).

**SIGNED** in Houston, Texas, this 20th day of August, 2018.

_____
U.S. MAGISTRATE JUDGE